*In the Matter of Cindy Isely, Personal Representative of the Estate of Bonnie Campbell*, No. 16, September Term, 2024.  Opinion by Fader, C.J.

**OBSTACLE PREEMPTION – PRESUMPTION AGAINST PREEMPTING STATE FAMILY LAW – FEDERAL EMPLOYEES' RETIREMENT SYSTEM ACT OF 1986**

Federal law preempts state law to the extent that state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.  However, state family law must do major damage to clear and substantial federal interests before the Supremacy Clause demands preemption.  The purposes of the Federal Employees' Retirement System Act of 1986 ("FERSA"), as identified by Congress, consist of establishing a federal employee retirement plan coordinated with the Social Security Act, ensuring that the plan is fully funded and financially sound, enhancing the portability of federal employee retirement assets, providing retirement plan options for federal employees, helping build a quality career federal workforce, encouraging retirement savings by federal employees, and extending disability protection for federal employees.  FERSA's primary purposes do not concern plan beneficiaries.

**OBSTACLE PREEMPTION – FEDERAL EMPLOYEES' RETIREMENT SYSTEM ACT OF 1986 – BENEFICIARY AND ORDER OF PRECEDENCE PROVISIONS – POST-DISTRIBUTION CONTRACT ACTION ARISING FROM DIVORCE SETTLEMENT AGREEMENT**

FERSA does not preempt an estate's post-distribution breach of contract action to enforce the terms of a court-approved divorce property settlement agreement.  Sections 8433(e)(1) and 8435(c)(2) elevate the requirements of a qualifying state property settlement agreement over a deceased participant's designated beneficiary.  Such an agreement is qualifying if (1) it relates to the Thrift Savings Plan and (2) notice of it has been received by the federal government before payment is made.  The federal purposes and objectives served by the advance notice requirement are (1) administrative convenience and (2) precluding double payment by the government.  A post-distribution suit to enforce contractual obligations in a divorce property settlement agreement does not hinder any governmental interest in administrative convenience or avoiding double payment.

**OBSTACLE PREEMPTION – FEDERAL EMPLOYEES' RETIREMENT SYSTEM ACT OF 1986 – ANTI-ASSIGNMENT CLAUSE – POST-DISTRIBUTION CONTRACT ACTION ARISING FROM DIVORCE SETTLEMENT AGREEMENT**

FERSA's anti-assignment clause does not preempt an estate's post-distribution breach of contract action.  It protects funds in the Thrift Savings Plan, not funds that have been distributed.

IN THE SUPREME COURT

OF MARYLAND

No. 16

September Term, 2024

_____

IN THE MATTER OF CINDY ISELY,
PERSONAL REPRESENTATIVE OF THE
ESTATE OF BONNIE CAMPBELL

_____

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,

JJ.

_____

Opinion by Fader, C.J.

_____

Filed: January 28, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

State family law will be preempted by federal law if the state law "do[es] 'major damage' to 'clear and substantial' federal interests." *Hillman v. Maretta*, 569 U.S. 483, 490-91 (2013) (quoting *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 581 (1979)). This appeal requires us to determine whether the Federal Employees' Retirement System Act of 1986 ("FERSA") preempts Maryland law concerning the enforceability of a court-approved divorce property settlement agreement. Under the circumstances presented here, we hold that it does not.

Bonnie Campbell, who is now deceased, and Michael Campbell, the respondent, entered into a divorce property settlement agreement that was incorporated but not merged into their divorce judgment. In the agreement, Mr. Campbell waived and agreed to disclaim all rights in a federal retirement plan account held by Ms. Campbell. Ms. Campbell later died without having removed Mr. Campbell as the beneficiary of her account; and Mr. Campbell, notwithstanding the agreement, sought and received the balance of Ms. Campbell's retirement assets. Her estate (the "Estate")[1] sued Mr. Campbell to enforce the agreement through, as relevant here, a cause of action for breach of contract seeking money damages. Mr. Campbell contends that FERSA preempts Maryland law to the extent that Maryland law would permit the Estate to enforce the terms of the agreement.

We hold that the Estate's post-distribution of benefits lawsuit seeking money damages for breach of the agreement does not damage any federal interest embodied in

---

[1] The petitioner is Cindy Isely, personal representative of the Estate.

FERSA. Accordingly, Maryland law is not preempted. We will therefore reverse the judgment of the Appellate Court.

## BACKGROUND

### A.    *Factual Background*

Ms. Campbell was a federal employee who opened and contributed to a Thrift Savings Plan ("TSP") account during her federal service. The TSP is a defined contribution retirement plan, akin to a 401(k) plan, that is governed by FERSA and administered by the Federal Retirement Thrift Investment Board. *See* 5 U.S.C. §§ 8431-8440f, 8472(a). Ms. Campbell designated Mr. Campbell as the sole beneficiary of her account should she die with funds still in it.

The Campbells divorced in 2010. The Judgment of Absolute Divorce incorporated but did not merge the terms and provisions of the Campbells' 40-page divorce property settlement agreement (the "Agreement"). In the section of the Agreement devoted to their retirement assets, the parties agreed that Mr. Campbell would make a payment of more than $15,000 from his 401(k) account to Ms. Campbell's TSP account, thereby equalizing the amount of marital funds in each. As set forth in three separate provisions of the Agreement, each party thereafter was to maintain ownership of the funds in their respective accounts.[2]

---

[2] In addition to her TSP, Ms. Campbell also had a Federal Employee Retirement System pension. The parties agreed that Mr. Campbell would receive a portion of the marital share of that pension and would be entitled to elect a survivor annuity with respect to his share of payments. Those benefits are not at issue here.

3

First, Paragraph 7.C.8 of the Agreement provides that, other than as set forth elsewhere in the Agreement, each party "expressly waives any legal or equitable right" they had or would acquire as a spouse, former spouse, or beneficiary in any type of retirement plan, including "Federal Thrift Savings Plans."

Second, Paragraph 6.D specifically contemplates a party dying without having changed any pre-agreement designation of the other as a beneficiary of a retirement plan. Pursuant to that paragraph, which is expressly applicable to a "Thrift Savings Plan," each party, "notwithstanding such designation by the deceased party": (1) "waives and relinquishes any and all rights he or she might have as a beneficiary . . . to receive the proceeds . . . in connection with any such" plan; and (2) "irrevocably assign[s] any rights he or she might have to receive such proceeds, benefits or amounts payable to the estate of the deceased party[.]"

Third, Paragraph 7.C.11 provides that in the event a party fails to change a beneficiary of a retirement plan, among other events, "the surviving party shall, at the direction and at the sole discretion of the decedent's personal representative," take one of three actions: (1) disclaim in writing any entitlement to benefits; (2) assign all rights to receive the benefits to the deceased party's estate or personal representative; or (3) pay the net after-tax benefits to the estate or personal representative.

The circuit court's divorce judgment expressly reserved jurisdiction to the circuit court "for the receipt, entry, alteration, and/or amendment . . . of any appropriate order(s)

4

pertaining to retirement benefits so as to effectuate the intent of the parties as expressed in their agreement[.]"

Ms. Campbell died in August 2019. Less than two months later, Mr. Campbell completed and submitted a TSP form titled "Information Relating to Deceased Participant." On the form, Mr. Campbell provided information about his relationship to Ms. Campbell, which he described as divorced after having been "married over 10 years." He further indicated that Ms. Campbell was unmarried and without children or parents at the time of her death, and that he did not know whether there was an executor or administrator for her estate. In response to a prompt to provide "any information that may be relevant to the disposition of the deceased participant's account," Mr. Campbell wrote "divorce decree available on request." Mr. Campbell did not provide a copy of the divorce judgment, the Agreement, or any additional information.

A few months later, the government transferred to Mr. Campbell $734,334.35, representing the total value of Ms. Campbell's TSP account, less standard withholdings. Until litigation was commenced, Mr. Campbell never informed the Estate that he sought or received the balance of Ms. Campbell's TSP account.

### B.    *Procedural Background*

After the Estate discovered that Mr. Campbell had received the sums in Ms. Campbell's TSP account, it sued him in the Circuit Court for Montgomery County. The complaint contained three counts that were identified as: (1) specific performance; (2) damages arising from breach of the settlement agreement; and (3) conversion. In the

5

breach counts,[3] the Estate alleged that Mr. Campbell breached the Agreement by failing to take any of the three paths—disclaim, assign, or pay—outlined in Paragraph 7.C.11. In the conversion count, the Estate alleged that Mr. Campbell knowingly and wrongfully retained dominion and control over TSP proceeds that he knew he was not entitled to keep.

Mr. Campbell moved to dismiss on the ground of FERSA preemption. The Estate opposed his motion and sought summary judgment in its favor. The circuit court rejected Mr. Campbell's preemption argument, granted summary judgment for the Estate on its breach of contract claim for money damages, and denied summary judgment for specific performance and on the conversion claim.[4] The court then entered a judgment in favor of the Estate in the amount of $734,334.35, awarded prejudgment interest and attorney's fees and costs, and, with the consent of the parties, dismissed the remaining counts of the complaint without prejudice.

In a reported opinion, a divided Appellate Court held that the Estate's breach of contract claim is preempted by FERSA. *In the Matter of Batchelor*, 260 Md. App. 456,

---

[3] Specific performance, like money damages, is a remedy. *See Falls Garden Condo. Ass'n v. Falls Homeowners Ass'n*, 441 Md. 290, 308 n.8 (2015). It is not a cause of action. So counts one and two of the complaint are, in effect, identical breach of contract claims requesting two separate remedies.

[4] The court denied summary judgment on counts one and three on the grounds that: (1) specific performance is not available because there is another available legal remedy in the form of money damages; and (2) the Estate is not entitled to judgment on its conversion claim because it had not established that the monies at issue had been held in a segregated account or were specific and identifiable. Neither of those rulings is challenged here.

6

460 (2024).[5] The majority concluded that three United States Supreme Court cases finding state family laws preempted by federal life insurance statutes "involve similar statutory provisions and facts" as FERSA and the underlying facts here, *id.* at 468-70, and required reaching the same result here, *id.* at 468-78. In dissent, Judge Nazarian acknowledged a strong federal interest in ensuring payment of FERSA benefits is completed without state interference but concluded that interest did not extend beyond initial distribution. *Id.* at 484, 490 (Nazarian, J., dissenting).

We granted certiorari to decide whether FERSA preempts the Estate's assertion of rights arising from the Campbells' divorce settlement agreement.

## DISCUSSION

### I. THE APPLICABLE LEGAL LANDSCAPE

#### A. *Standard of Review*

The sole issue before this Court is whether FERSA preempts Maryland law to the extent that Maryland law would permit the Estate to enforce the terms of the Agreement. We review the Appellate Court's determination on that legal question without deference. *United Food & Com. Workers Int'l Union v. Wal-Mart Stores, Inc.*, 453 Md. 482, 494 (2017).

---

[5] Brenda Batchelor was originally appointed as the personal representative of Ms. Campbell's Estate. *See In the Matter of Batchelor*, 260 Md. App. at 460. Ms. Isely has since replaced Ms. Batchelor as the successor personal representative.

### B.       *Obstacle Preemption*

The Supremacy Clause of the United States Constitution provides Congress with the power to preempt state law.  U.S. Const. art. IV, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; . . . shall be the supreme Law of the Land[.]"); *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 477 (2018); *United Food*, 453 Md. at 494.  "Pre-emption fundamentally is a question of congressional intent[.]"  *English v. Gen. Elec. Co.*, 496 U.S. 72, 78-79 (1990).  That intent can be expressed explicitly or implicitly.  *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008).  No express preemption clause is at issue here.

The United States Supreme Court has recognized two subcategories of implied preemption—field and conflict, *id.*—and two types of conflict preemption—impossibility and obstacle,[6] *see Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-73 (2000).  Here, we are concerned with the obstacle variety of conflict preemption.

Obstacle preemption covers cases in which, "under the circumstances," a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *see also id.* at 67 n.20 ("[I]f [the federal law's] operation within its chosen field else must be frustrated and

---

[6] Impossibility preemption exists in narrow circumstances.  *See* Caleb Nelson, *Preemption*, 86 Va. L. Rev. 225, 228-29 (2000).  To qualify, state law must require what federal law prohibits, or vice versa, such that it is a "physical impossibility" for an individual to comply with both.  *See Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 31 (1996); Nelson, above, at 228 & n.15.  Obstacle preemption covers all other kinds of "implicit" conflicts.  *See* Nelson, above, at 228-29.

its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power." (quoting *Savage v. Jones*, 225 U.S. 501, 533 (1912))). What will serve as "a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects[.]" *Crosby*, 530 U.S. at 373. The United States Supreme Court has considered text, structure, and legislative history to determine Congress' full purposes and objectives in enacting a federal law. *See, e.g.*, *id.* at 373, 375 n.9.

In "areas traditionally regulated by the States[,]" *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 13 (2013), our analysis begins "with the assumption that the historic police powers of the States [are] not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress[,]" *Altria Grp.*, 555 U.S. at 77 (second alteration added) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). Thus, "[o]n the rare occasion when state family law [may] come into conflict with a federal statute, [the United States Supreme] Court has limited review under the Supremacy Clause to a determination whether Congress has 'positively required by direct enactment' that state law be pre-empted." *Hisquierdo*, 439 U.S. at 581 (quoting *Wetmore v. Markoe*, 196 U.S. 68, 77 (1904)).

Applying a "'presumption against pre-emption' of state laws governing domestic relations," *Hillman*, 569 U.S. at 490 (quoting *Egelhoff v. Egelhoff*, 532 U.S. 141, 151 (2001)), the Supreme Court has observed that "[a] mere conflict in words is not sufficient," *Hisquierdo*, 439 U.S. at 581. Rather, state "family and family-property law must do 'major

9

damage' to 'clear and substantial' federal interests before the Supremacy Clause will demand that state law be overridden." *Hillman*, 569 U.S. at 490-91 (quoting *Hisquierdo*, 439 U.S. at 581). Even so, "family law is not entirely insulated from conflict pre-emption principles, and so [the Court has] recognized that state laws 'governing the economic aspects of domestic relations . . . must give way to clearly conflicting federal enactments.'" *Id.* at 491 (quoting *Ridgway v. Ridgway*, 454 U.S. 46, 55 (1981)).

## C.    FERSA

Mr. Campbell contends that FERSA preempts the Estate's claims. We consider FERSA as a whole to identify its purposes and intended effects as part of our preemption analysis. *See Crosby*, 530 U.S. at 373.

### 1.    The Purposes of FERSA

FERSA establishes a comprehensive retirement system for federal employees. *See* 1986 U.S.C.C.A.N. 1544 (signing statement of President Reagan). We need not look beyond FERSA's text to identify its primary purposes and objectives:

> The purposes of [FERSA] are—
>
> (1) to establish a Federal employees' retirement plan which is coordinated with title II of the Social Security Act;
>
> (2) to ensure a fully funded and financially sound retirement benefits plan for Federal employees;
>
> (3) to enhance portability of retirement assets earned as an employee of the Federal Government;
>
> (4) to provide options for Federal employees with respect to retirement planning;
>
> (5) to assist in building a quality career work force in the Federal Government;

(6) to encourage Federal employees to increase personal savings for retirement; and

(7) to extend financial protection from disability to additional Federal employees and to increase such protection for eligible Federal employees.

Pub. L. No. 99-335, § 100A, 100 Stat. 516; *see also* 5 U.S.C. § 8401 revisor's note.

Consistent with its purposes, FERSA is designed to provide retirement benefits to participants. Thus, pursuant to 5 U.S.C. § 8433, a participant "who separates from Government employment is entitled to the amount of the balance in the [participant's] account[.]" 5 U.S.C. § 8433(a). The participant may elect to receive that balance as an annuity, a lump sum payment, multiple payments, or any combination thereof, and may request that payments be made to another eligible retirement plan. *Id.* § 8433(b), (c)(2).

### 2. *FERSA Provisions Related to Benefits Upon a Participant's Death*

Although its primary design is to provide for federal employees in retirement, FERSA contemplates that participants may die before making their election of benefits:

> If [a participant] dies without having made an election under this section . . . , an amount equal to the value of that individual's account (as of death) shall, *subject to any decree, order, or agreement referred to in section 8435(c)(2) of this title* be paid in a manner consistent with section 8424(d) of this title.

*Id.* § 8433(e)(1) (emphasis added). The statute thus directs us first to § 8435(c)(2) and, subject to any application of that provision, to § 8424(d). We will address each in turn.

### a. 5 U.S.C. § 8435(c)

Section 8435(c) provides that an election or change of election of TSP benefits "shall not be effective . . . to the extent that the election . . . conflicts with . . . a court decree of divorce, annulment, or legal separation," or any associated "court-approved property

11

settlement agreement," between the participant and a former spouse (1) that relates to the TSP account, and (2) for which notice was received by the TSP before payment is made.[7] In other words, § 8435(c) nullifies a separated participant's election of benefits that conflicts with a covered court decree or associated property settlement agreement. Although the plain language of § 8435(c) applies only to the election or change of election

---

[7] 5 U.S.C. § 8435(c) provides in full:

(c)(1) An election or change of election shall not be effective under this subchapter to the extent that the election, change, or transfer conflicts with any court decree, order, or agreement described in paragraph (2).

(2) A court decree, order, or agreement referred to in paragraph (1) is, with respect to an employee or Member (or former employee or Member), a court decree of divorce, annulment, or legal separation issued in the case of such employee or Member (or former employee or Member) and any former spouse of the employee or Member (or former employee or Member) or any court order or court-approved property settlement agreement incident to such decree if

(A) the decree, order, or agreement expressly relates to any portion of the balance in the employee's or Member's (or former employee's or Member's) account; and

(B) notice of the decree, order, or agreement was received by the Executive Director before—

(i) the date on which payment is made, or

(ii) in the case of an annuity, the date on which an annuity contract is purchased to provide for the annuity, in accordance with the election, change, or contribution referred to in paragraph (1).

(3) The Executive Director shall prescribe regulations under which this subsection shall be applied in any case in which the Executive Director receives two or more decrees, orders, or agreements referred to in paragraph (1).

12

of benefits by a separated participant, it is made applicable by § 8433(e)(1) to payment of benefits upon the death of a participant who had not made an election, as discussed above.

### b.     5 U.S.C. § 8424(d)

Section 8424(d) establishes an "order of precedence" for the lump sum distribution of benefits upon the death of a covered employee. As several aspects of the provision will be relevant to our analysis, we quote it here in full:

> (d) Lump-sum benefits authorized by subsections (e) through (g) shall be paid to the individual or individuals surviving the employee or Member and alive at the date title to the payment arises in the following order of precedence, and the payment bars recovery by any other individual:
>
> First, to the beneficiary or beneficiaries designated by the employee or Member in a signed and witnessed writing received in the Office before the death of such employee or Member. For this purpose, a designation, change, or cancellation of beneficiary in a will or other document not so executed and filed has no force or effect.
>
> Second, if there is no designated beneficiary, to the widow or widower of the employee or Member.
>
> Third, if none of the above, to the child or children of the employee or Member and descendants of deceased children by representation.
>
> Fourth, if none of the above, to the parents of the employee or Member or the survivor of them.
>
> Fifth, if none of the above, to the duly appointed executor or administrator of the estate of the employee or Member.
>
> Sixth, if none of the above, to such other next of kin of the employee or Member as the Office determines to be entitled under the laws of the domicile of the employee or Member at the date of death of the employee or Member.
>
> For the purpose of this subsection, "child" includes a natural child and an adopted child, but does not include a stepchild.

First priority is to properly designated beneficiaries. *Id.* Only if there is no properly designated beneficiary does the TSP then look, in descending order of priority, to the

13

participant's widow or widower; child, children, or their descendants; parents; estate; or other next of kin. *Id.*

A participant is authorized to "designate one or more beneficiaries" of a TSP account. *Id.* § 8424(c); *see also* 5 C.F.R. § 1651.3(a) (same). The participant may also change that designation. 5 C.F.R. § 1651.4(a). Any such designation or change can be accomplished without the knowledge or consent of the beneficiary or the participant's spouse. *Id.* §§ 1651.3(b), 1651.4(a). However, to be effective, the participant's designation or change of beneficiary must meet certain validity requirements, and it must be submitted to the TSP before the participant's death.[8] 5 U.S.C. § 8424(d); 5 C.F.R. §§ 1651.3(c), 1651.4(a).

Section 8424(d) expressly precludes the use of a "will or other document" to designate or change the designation of a beneficiary. It does so by stating that "[f]or this

---

[8] FERSA and its implementing regulations use different terms in describing to whom notice or documentation must be provided. Section 8424(d) requires that a designation of a beneficiary or beneficiaries be "received in the Office," which is defined as "the Office of Personnel Management." 5 U.S.C. § 8401(24). FERSA's implementing regulations require that a designation of beneficiary "[b]e received by the TSP record keeper," which is defined as "the entities the Board engages to perform record keeping and administration services for the Thrift Savings Plan." 5 C.F.R. § 1690.1. And § 8435(c) requires that, to take precedence over a beneficiary designation, notice of a divorce decree or associated property settlement agreement must be "received by the Executive Director," which is defined to mean the Executive Director appointed by the Federal Retirement Thrift Investment Board. 5 U.S.C. § 8401(5), (13) (defining "Board" and "Executive Director"); *id.* § 8474(a) (providing for the appointment of the Executive Director by the Board).

The parties have not called our attention to any significance of these different designations in connection with the issues before us, and we are not aware of any. Accordingly, we will treat all notice requirements as requiring notice to the TSP without regard to the specific individual or entity identified in a provision.

purpose"—meaning for the purpose of designation of a beneficiary—"a designation, change, or cancellation of beneficiary in a will or other document not so executed and filed"—meaning *not* "in a signed and witnessed writing received in the Office before the [participant's] death"—"has no force or effect." 5 U.S.C. § 8424(d); *see also* 5 C.F.R. §§ 1651.3(d), 1651.4(c) (together providing that a participant cannot designate or change a beneficiary in a will).

### c. Interaction Among §§ 8433(e), 8435(c), and 8424(d)

In sum, in the circumstance in which a TSP participant dies without having made an election of benefits, § 8433(e) provides that the value of the participant's account be paid consistent with the order of precedence in § 8424(d) *subject to* the terms of "any decree, order or agreement referred to in section 8435(c)(2)." In other words, if there is an applicable decree, order, or agreement of which the TSP has received notice, the TSP is to honor that decree, order, or agreement.[9] Otherwise, the TSP is to make payment according to the order of precedence in § 8424(d).

### 3. *The TSP Anti-Assignment Clause*

The final provision of FERSA that is relevant to our analysis is the anti-assignment clause applicable to the TSP, found in 5 U.S.C. § 8437(e)(2). Section 8437 establishes the

---

[9] There is no conflict between § 8424(d)'s provision that a "will or other document" purporting to designate or change a beneficiary of a TSP account is "of no force and effect" and the precedence provided to, among other things, a divorce property settlement agreement by § 8435(c). Section 8435(c), in combination with § 8433(e)(1), requires the TSP to honor the provisions of a covered divorce decree over the designation of any beneficiary or beneficiaries when making payment; it does not treat such a decree as designating or changing beneficiaries.

Thrift Savings Fund to hold all sums contributed by participants and employing agencies, along with investment earnings. *Id.* § 8437(a), (b). The section includes provisions generally applicable to the Fund, including establishing the purposes for which the sums in it may and may not be used, how administrative expenses are to be paid, and that monies in the Fund are held in trust. *Id.* § 8437(c), (d), (f), (g).

In that context, § 8437(e)(1) establishes that "sums in the Thrift Savings Fund credited to the account of [a participant] may not be used for, or diverted to, purposes other than for the exclusive benefit of the [participant or the participant's] beneficiaries under this subchapter." Subsection (e)(2), the anti-assignment clause, then provides: "[S]ums in the Thrift Savings Fund may not be assigned or alienated and are not subject to execution, levy, attachment, garnishment, or other legal process."[10]  *Id.* § 8437(e)(2).

### D.    *Obstacle Preemption in the Life Insurance Context*

The United States Supreme Court has not considered the preemptive effect of FERSA vis-à-vis state family law. The Court has, however, considered the preemptive effect of three federal life insurance programs vis-à-vis state family law in the following cases: *Wissner v. Wissner*, 338 U.S. 655 (1950); *Ridgway v. Ridgway*, 454 U.S. 46 (1981); and *Hillman v. Maretta*, 569 U.S. 483 (2013). In each of those cases, the Court recognized a federal interest in honoring the participant's choice of beneficiary sufficient to preempt state family laws that would have led to a different result. The parties disagree about the

---

[10] Subsection (e)(3) identifies certain exceptions to this general prohibition, none of which are applicable here.

16

implications of those decisions here. As we will discuss, those decisions turned on both the purposes and interests underlying those specific statutory schemes and the state laws at issue. Both differ in important respects from the purposes and interests underlying FERSA and the state law at issue here.

### *1.* **Wissner v. Wissner**

In *Wissner*, the Supreme Court considered a conflict between the National Service Life Insurance Act of 1940 ("NSLIA") and California's community property laws. 338 U.S. at 656. NSLIA provided federal life insurance policies for service members and veterans. *Id.* at 658. The decedent in *Wissner*, estranged from his spouse at the time of his death, had named his mother as his principal beneficiary. *Id.* at 657. The estranged spouse sued the mother, claiming that California community property law entitled her to half of NSLIA policy proceeds. *Id.* The lower court agreed. *Id.* at 658.

In a 5-3 decision, the Supreme Court reversed. The Court deduced from NSLIA's absolute right of the policyholder to designate and change the beneficiary at any time, and the "liberal policy toward the service[ member] and [the] named beneficiary" "everywhere evident" in the statutory plan, that a central purpose of NSLIA was honoring the service member's choice of beneficiary. *Id.* at 658-59 (citing 38 U.S.C. § 802(g) (1946)). The Court found no contrary provision suggesting a "congressional purpose that widows in community property states participate in the payments under the policy, contrary to the express direction of the insured." *Id.* at 659. The lower court's ruling in favor of the widow thus conflicted with a primary purpose of NSLIA. *Id.*

17

The Court also relied on a broad anti-attachment provision in NSLIA: "Payments to the named beneficiary 'shall be exempt from the claims of creditors, and shall not be liable to attachment, levy, or seizure by or under any legal or equitable process whatever, *either before or after receipt by the beneficiary*.'" *Id.* (emphasis added) (quoting 38 U.S.C. § 454a (1946)). The Court determined that the trial court's order directing "the diversion of future payments as soon as they are paid by the Government to the mother" violated the prohibition against attachment of benefits "after receipt by the beneficiary." *Wissner*, 338 U.S. at 659.

### 2. Ridgway v. Ridgway

In *Ridgway*, the Supreme Court undertook a similar analysis with respect to the Servicemen's Group Life Insurance Act of 1965 ("SGLIA"), the successor to NSLIA. 454 U.S. at 50-51. There, the decedent's divorce decree required him to maintain life insurance coverage for the benefit of the parties' children. *Id.* at 48. Instead, he changed the beneficiary to his new spouse. *Id.* at 48-49. After he died, a state court held that a constructive trust should be imposed on the life insurance proceeds for the children's benefit. *Id.* at 49-50.

The Supreme Court reversed in another 5-3 decision. As with NSLIA, the Court identified a primary congressional purpose of giving effect to the policyholder's choice of beneficiary from several provisions of the law and its implementing regulations: (1) a provision permitting a policyholder to designate a beneficiary and alter that choice at any time, *id.* at 53, 55-56 (quoting 38 C.F.R. § 9.16(e) (1980)); (2) a regulation prohibiting any

18

change or cancellation of beneficiary by a will or other document unless it was in writing, signed by the insured, and received by the appropriate office before the death of the insured, *id.* at 53 (quoting 38 C.F.R. § 9.16(f) (1980)); and (3) an order of precedence that identified the chosen beneficiary at the top of the distribution order, *id.* at 52. The Court interpreted these "pervasive and detailed characteristics" regarding beneficiary designation as establishing that "[t]he obvious and stated concern of Congress was to provide coverage for the member, no matter how hazardous the duty, and thus protection for the member's designated beneficiaries." *Id.* at 53. SGLIA's "unqualified directive [was] to pay the proceeds to the properly designated beneficiary[.]" *Id.* at 57.[11]

As in *Wissner*, the Court also relied on the broad anti-attachment provision in SGLIA, which prohibited "attachment, levy, or seizure by or under any legal or equitable process whatever, *either before or after receipt by the beneficiary*." *Id.* at 52-53 (emphasis added) (quoting 38 U.S.C. § 770(g) (1976)). Nothing in SGLIA "indicate[d] that Congress intended to exempt claims based on property settlement agreements from the strong language of the anti-attachment provision." *Id.* at 61.

---

[11] Even though the Court prohibited the former spouse's suit against the beneficiary, the Court noted that the "respondents may have a claim against the insured's estate for . . . breach [of contract.]" *Ridgway*, 454 U.S. at 59. There, the beneficiary and the other party to the settlement agreement—the decedent—were different people. Here, they are one in the same. *Ridgway* did not address a situation where the beneficiary himself has voluntarily entered into a contractual agreement to pay proceeds to the policyholder's estate.

### 3. **Hillman v. Maretta**

Finally, in *Hillman*, the Court considered the preemptive effect of the Federal Employees' Group Life Insurance Act of 1954 ("FEGLIA"), which establishes a comprehensive life insurance program for federal employees. 569 U.S. at 485. The decedent had a FEGLIA policy for which he named his then-spouse as the sole beneficiary. *Id.* at 488. They divorced and the decedent remarried, but he never changed his beneficiary designation. *Id.* at 488-89.

The decedent's second spouse sued his former spouse to recover the life insurance proceeds pursuant to a Virginia statute that contained two provisions intended to defeat life insurance beneficiary designations. First, Section A of the law automatically revoked any beneficiary designation upon entry of a divorce decree. *Id.* at 488, 501 (citing Va. Code § 20-111.1(A) (2012)). The parties agreed that Section A was preempted by FEGLIA because it purported to authorize a change in beneficiary outside of the required federal channels. *Id.* at 489. Second, Section D of the law created a contingency plan in the event Section A was "preempted by federal law." *Id.* at 488 (quoting Va. Code § 20-111.1(D) (2012)). Section D established a cause of action for recovery of the benefits in favor of the person who would have received life insurance benefits under Section A against the actual recipient. *Id.*

The Supreme Court of Virginia held that Section D was preempted by FEGLIA. *Id.* at 489. The United States Supreme Court unanimously affirmed, concluding that FEGLIA preempts state laws that automatically assign an interest in the proceeds of a FEGLIA

policy to a person other than the named beneficiary.[12]  *Id.* at 489-90.  In effect, the Court held that state law could not do indirectly what it was prohibited from doing directly:  automatically effect a change in the beneficiary of a federal life insurance policy through an unauthorized channel.  *See id.* at 494.

In identifying the federal purposes underlying FEGLIA, the Court held that they were both "administrative convenience" and that the insured's choice of beneficiary can both receive and use policy proceeds.[13]  *Id.* at 491, 495.  It drew those dual objectives from two aspects of the statute:  (1) its order of precedence, which gave "highest priority to an insured's designated beneficiary[,]" *id.* at 493; and (2) its implementing regulations

---

[12] The Court was unanimous in its judgment but not in its reasoning.  Justices Thomas and Alito concurred.  *See Hillman*, 569 U.S. at 499 (Thomas, J., concurring); *id.* at 502 (Alito, J., concurring).  Justice Alito's concurrence is of particular interest here.  Given the prior decisions in *Wissner* and *Ridgway*, he read FEGLIA to have two primary purposes:  (1) administrative convenience and (2) "the effectuation of the insured's *expressed* intent above all other considerations."  *Id.* at 503 (Alito, J., concurring).  Like the majority, he would not have read Section D to impede the first purpose because it operated only after the funds are received.  But because Section D would have allowed another person to seek the funds from the beneficiary on a basis "not based on the insured's expressed intent," Justice Alito understood it as conflicting with FEGLIA's second purpose.  *Id.* at 503-04.  However, Justice Alito took issue with the majority's suggestion that the designated beneficiary must be allowed to keep the insurance proceeds "even if the insured's contrary and expressed intent is indisputable—for example, when the insured writes a postdivorce will specifically leaving the proceeds to someone else."  *Id.* at 504.  He was "doubtful that any purpose or objective of FEGLIA would be honored" by that outcome.  *Id.*

[13] The Court acknowledged that if administrative convenience were the sole federal purpose underlying FEGLIA, "then there might be no conflict between Section D and FEGLIA" because Section D applied only post-distribution.  *Hillman*, 569 U.S. at 491.

regarding the policyholder's right to designate a beneficiary, *id.* at 493-94 (stating that the right to change a beneficiary "cannot be waived or restricted").

The Court also observed that FEGLIA's order of precedence provision rendered an attempt to designate or change a beneficiary through a "will or other document" of "no force or effect." *Id.* at 487 (alteration omitted) (quoting 5 U.S.C. § 8705(a) (2012)). The Court noted that the only "limited exception" to that prohibition allows a qualifying divorce decree or associated property settlement agreement to supersede the order of precedence if it is received by the employing agency before the employee's death, thus still managing a departure from the beneficiary designation "within, not outside, the federal system." *Id.* at 495-96. *Hillman* did not involve a qualifying divorce decree. But the Court reasoned that the existence of that limited exception meant that "additional exceptions are not to be implied." *Id.* at 496 (quoting *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616-17 (1980)). The Court therefore refused to read into FEGLIA an exception for laws like Section D.[14]

## II. FERSA DOES NOT PREEMPT THE ESTATE'S BREACH OF CONTRACT CLAIM.

With that background, we turn to the question before us, which is whether enforcement of the Agreement would do "'major damage'" to "'clear and substantial' federal interests" embodied in FERSA so as to overcome the "'presumption against pre-

---

[14] FEGLIA did not contain an anti-attachment clause like the laws at issue in *Wissner* and *Ridgway*. However, the Court observed, those clauses merely provided alternative grounds for the Court's judgments in those cases, "not necessary components of the holdings." *Hillman*, 569 U.S. at 497.

emption' of state laws governing domestic relations." *Hillman*, 569 U.S. at 490-91 (first and second, quoting *Hisquierdo*, 439 U.S. at 581; third, quoting *Egelhoff*, 532 U.S. at 151).

"To determine whether a state law conflicts with Congress' purposes and objectives, we must first ascertain the nature of the federal interest." *Hillman*, 569 U.S. at 491. That inquiry is statute-specific, as there is no "rigid formula or rule which can be used as a universal pattern to determine the meaning and purpose of every act of Congress." *Hines*, 312 U.S. at 67. Our focus is on the "federal statute as a whole," *Crosby*, 530 U.S. at 373, not individual provisions removed from context.

As an initial matter, we reject Mr. Campbell's contention that the outcome of this preemption analysis is dictated by the results of *Wissner*, *Ridgway*, and *Hillman* based on the similarity of certain provisions in the laws at issue in those cases and in FERSA. To be sure, our preemption *analysis* is governed by the analysis of the United States Supreme Court in those and other cases. But that analysis requires us to examine the purposes and objectives of FERSA, which creates a retirement system for federal employees. The purposes and objectives of FERSA are quite different from the purposes and objectives of NSLIA, SGLIA, and FEGLIA, all of which established life insurance programs that shared a primary purpose "to ensure that a federal employee's named beneficiary receives the proceeds." *Hillman*, 569 U.S. at 494.

### A. FERSA's Primary Purposes

As discussed, Congress left no mystery concerning its seven purposes in enacting FERSA. It set them out expressly in the law itself. They consist of establishing a federal

23

employee retirement plan coordinated with the Social Security Act, ensuring that the plan is "fully funded and financially sound," enhancing the portability of federal employee retirement assets, providing retirement plan options for federal employees, helping build a quality career federal workforce, encouraging retirement savings by federal employees, and extending disability protection for federal employees. Pub. L. No. 99-335, § 100A, 100 Stat. 516; *see also* 5 U.S.C. § 8401 revisor's note. Nowhere in the stated purposes of FERSA is there any reference to what is to happen if a federal employee who invests in a FERSA-created retirement plan dies before accessing those benefits.

Enforcement of the Agreement would not do any damage, much less major damage, to any of the seven purposes of FERSA. Mr. Campbell has not suggested that it would.

Instead, Mr. Campbell claims that enforcement of the Agreement would interfere with a separate federal interest that is implicit in the statute's provisions. We turn to that argument next.

### B.      *FERSA's Beneficiary and Order of Precedence Provisions*

Mr. Campbell contends that, like the federal life insurance statutes discussed above, FERSA furthers a federal purpose to ensure "that insurance proceeds belong to the named beneficiary." *Hillman*, 569 U.S. at 499. Mr. Campbell focuses on two aspects of FERSA that are similar to the federal life insurance statutes: (1) FERSA's beneficiary and order of precedence provisions; and (2) FERSA's anti-assignment clause. We will explore each in turn.

24

Mr. Campbell is correct that many aspects of FERSA's beneficiary and order of precedence provisions are similar to those in the life insurance statutes considered in *Wissner*, *Ridgway*, and *Hillman*. Specifically, a FERSA participant has the right to designate a beneficiary or beneficiaries and to make changes to that designation at the participant's sole discretion. And the participant's designated beneficiary has the highest standing on the order of precedence list in 5 U.S.C. § 8424(d).

But in considering legislative purpose we must look to the statute as a whole. Here, it is particularly notable that turning to the order of precedence at all is made "subject to any decree, order, or agreement referred to in section 8435(c)(2)," *id.* § 8433(e)(1), which includes a qualifying "court decree of divorce" and any associated court-approved property settlement agreement, *id.* § 8435(c)(2). Thus, FERSA's express provisions elevate the requirements of a qualifying divorce property settlement agreement over a deceased participant's designated beneficiary.[15]

To be sure, § 8435(c) does not elevate all divorce-related property settlement agreements over a deceased participant's designated beneficiary for purposes of payment by the TSP, only those between the participant and a former spouse (1) that relate to the

---

[15] It does not appear that the life insurance statutes at issue in either *Wissner* or *Ridgway* contained a provision similar to § 8435(c), making the order of precedence provisions in those statutes subject to the requirements of a qualifying divorce decree or associated property settlement. And although there is such a provision in FEGLIA, that was not what the plaintiff in *Hillman* was seeking to enforce. Instead, the plaintiff sought to enforce a Virginia statute that *automatically* provided a statutory cause of action, without regard to the terms of any court decree or settlement agreement. *Hillman*, 569 U.S. at 488.

TSP account and (2) for which notice was received by the TSP before payment is made. Here, the Agreement relates to the TSP account, but the TSP did not receive notice of its provisions before payment was made.[16] As a result, the TSP properly paid the benefits to Mr. Campbell instead of the Estate. The prior notice requirement, however, does not alter the congressional intent that the requirements of applicable divorce property settlement agreements take precedence over the statutory order of precedence in § 8424(d). A lack of prior notice of an agreement does not meaningfully alter any substantive interest concerning the proper recipient of the balance in a participant's account.

Instead, the federal purposes and objectives served by the advance notice requirement lie in (1) administrative convenience and (2) precluding double payment by the government. As to the former, the United States Supreme Court has recognized the "significant legislative interest in a large federal program," as FERSA undeniably is, in administrative convenience to enable efficient administration of the program. *Hillman*, 569 U.S. at 491. Without an advance notice requirement, the government and interested parties could face significant uncertainty in deciding when and to whom payment should be made. And the administrative burden would be substantial if a belated notice of a divorce property settlement agreement revealing that the government had paid the wrong

---

[16] Mr. Campbell provided notice of a sort of the existence of the Agreement when he filled out the TSP "Information Relating to Deceased Participant" form and wrote "divorce decree available on request." However, that notice was misleading at best and provided no notice to the TSP that Mr. Campbell was not entitled to the balance in Ms. Campbell's TSP account.

26

person could obligate the government to attempt to retrieve that payment to redirect it to the correct party.

Similarly, requiring advance notice of an applicable divorce property settlement agreement precludes the possibility of the government being asked to make payment to a second individual after having already made payment to another. That congressional purpose is also reflected in the provision of § 8424(d) that payment pursuant to the order of precedence "bars recovery by any other individual."[17] Together, the requirement of advance notice and the bar on recovery by anyone else once payment has been made mean that the federal government is required to make one payment based on the best information it has at that time, and that payment ends its obligation.

In sum, the beneficiary-related provisions of FERSA, including §§ 8433(e)(1) and 8435(c)(2), reveal a congressional intent to honor the requirements of a qualifying divorce property settlement agreement over a participant's designated beneficiary. However, due to competing federal interests in administrative convenience and avoiding the possibility of double payments, § 8435(c)(2) obliges the government to honor the requirements of a

---

[17] Mr. Campbell argues that we should interpret "bars recovery by any other individual" as barring recovery from the beneficiary, rather than the government. That interpretation is at odds with the plain language of the provision and its context. Section 8424 as a whole is focused entirely on the government's payment obligation. Section 8424(d) in particular is focused on who the government must pay in the event of a participant's death. It is in that context that the government's payment "to the individual or individuals surviving the [participant] . . . bars recovery by any other individual." 5 U.S.C. § 8424(d).

27

qualifying divorce property settlement agreement only if it receives notice of such an agreement before making payment.

A post-distribution suit to enforce contractual obligations in a divorce property settlement agreement does not hinder any governmental interest in administrative convenience or avoiding double payment. All federal purposes advanced in FERSA are unscathed. *Cf. Andochick v. Byrd*, 709 F.3d 296, 299, 301 (4th Cir. 2013) (holding that ERISA does not preempt post-distribution lawsuits against ERISA beneficiaries to enforce the terms of divorce agreements because doing so does not interfere with any of ERISA's three main objectives: "[1] simple administration, [2] avoid[ing] double liability [for plan administrators], and [3] ensur[ing] that beneficiaries get what's coming quickly" (quoting *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 555 U.S. 285, 301 (2009))); *Estate of Kensinger v. URL Pharma, Inc.*, 674 F.3d 131, 136-37 (3d Cir. 2012) (same).

Here, the Estate seeks damages for Mr. Campbell's failure to honor his obligation to disclaim any entitlement to such benefits or to pay the net after-tax benefits received from it to Ms. Campbell's estate or personal representative.[18] Taking either path would

---

[18] The Campbells' divorce settlement also contemplated a third way in which Mr. Campbell could have complied with his obligations, which would have been to "assign all rights to receive such . . . benefits to the estate of the deceased party[.]" As the full value of Ms. Campbell's TSP account has already been paid to Mr. Campbell, the Estate's lawsuit does not seek to force Mr. Campbell to make an assignment of his rights. We therefore have no occasion to determine whether that remedy would be preempted by FERSA.

have been perfectly consistent with the primary, as well as secondary, purposes and objectives of FERSA.[19]

### C.    FERSA's Anti-Assignment Clause

Consideration of FERSA's anti-assignment clause does not lead to a different result. 5 U.S.C. § 8437(e)(2) provides: "[S]ums in the Thrift Savings Fund may not be assigned or alienated and are not subject to execution, levy, attachment, garnishment, or other legal process." For at least three reasons, this clause does not support Mr. Campbell's preemption claim. First, by its plain language, the provision applies only to "sums in the Thrift Savings Fund." The monies that are subject to the Estate's breach of contract action have been paid to Mr. Campbell. They are therefore not "in the Thrift Savings Fund."

Second, that focus on monies *in* the Fund is particularly noteworthy in contrast to the anti-attachment provisions in the statutes at issue in *Wissner* and *Ridgway*. Both of those provisions were addressed not to sums in the plans but to payments to the beneficiary. *Wissner*, 338 U.S. at 659; *Ridgway*, 454 U.S. at 73 (Stevens, J., dissenting). Of even greater significance, both of those provisions expressly applied protection to such payments "either before or after receipt by the beneficiary."[20] *Wissner*, 338 U.S. at 659; *Ridgway*, 454 U.S.

---

[19] The United States Court of Appeals for the Tenth Circuit reached a different conclusion in *Evans v. Diamond*, 957 F.3d 1098 (10th Cir. 2020), based largely on the same rationale Mr. Campbell urges us to adopt here. For the reasons we have set forth in this opinion, we think our approach is more in line with the focus on statutory purposes and objectives of the specific federal statute at issue that is required by the United States Supreme Court's obstacle preemption jurisprudence.

[20] Mr. Campbell also attempts to draw an analogy between FERSA's anti-assignment clause and an anti-attachment clause in the Railroad Retirement Act, which the

at 52-53. The statutes at issue in *Wissner* and *Ridgway*, as well as the Supreme Court's decisions relying on the breadth of their anti-attachment clauses, all preceded Congress's adoption of FERSA. Congress was thus aware of how to protect payments made under federal programs "after receipt by the beneficiary." That it chose different language in FERSA is indicative of a different intent. *See Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 587 U.S. 601, 611 (2019) ("It is a commonplace of statutory interpretation that 'Congress legislates against the backdrop of existing law.'" (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 398 n.3 (2013))); *cf., e.g.*, *Tanzin v. Tanvir*, 592 U.S. 43, 51 (2020).

Third, the Estate's second breach of contract count, the only count at issue here, does not seek to accomplish, directly or indirectly, anything that is prohibited by § 8437(e)(2). In that count, the Estate seeks an award of money damages for Mr. Campbell's breach, along with prejudgment interest and attorneys' fees. It is not seeking an assignment of future payments from Mr. Campbell, nor to attach, levy on, or

United States Supreme Court interpreted to preclude a state community property law claim much like that in *Wissner*. *See Hisquierdo*, 439 U.S. at 578-79, 585. The Supreme Court held that the Railroad Retirement Act's anti-attachment clause extended to bar a judgment requiring the ongoing sharing of post-distribution annuity benefits pursuant to state community property law. *Id.* at 586. Unlike here, the judgment at issue in *Hisquierdo* applied to future benefits not yet paid. *Id.* at 579. The Court also found the anti-attachment clause at issue to be broad enough to apply to post-distribution legal process. *Id.* at 586 ("Section 231m goes far beyond garnishment. It states that the annuity shall not be subject to any 'legal process under any circumstances whatsoever, *nor shall the payment thereof be anticipated*.'" (emphasis added)). Moreover, following *Hisquierdo*, Congress amended the Railroad Retirement Act's anti-attachment clause to allow for community property claims and other kinds of court-approved property settlements. *See* 45 U.S.C. § 231m(b)(2); *see also* 129 Cong. Rec. H6150 (statement of Rep. John Seiberling); *Rose v. Rose*, 481 U.S. 619, 632 n.6 (1987).

30

garnish any monies in the Thrift Savings Fund.  The Estate's breach of contract claim for money damages neither directly violates nor stands as an obstacle to accomplishing any federal interest represented by FERSA's anti-attachment clause, § 8437(e)(2).[21]

## CONCLUSION

The Estate's post-distribution breach of contract claim against Mr. Campbell to enforce the terms of the Agreement does not interfere with any identified federal interests, much less do major damage to clear and substantial federal interests.  Accordingly, there is no preemption.  We will therefore reverse the judgment of the Appellate Court of Maryland and remand with instructions to affirm the judgment of the Circuit Court for Montgomery County.

---

[21] Mr. Campbell also invokes another anti-assignment clause in FERSA:  5 U.S.C. § 8470.  That clause provides that "[a]n amount payable under subchapter II, IV, or V of this chapter is not assignable, either in law or equity, except under the provisions of section 8465 or 8467, or subject to execution, levy, attachment, garnishment or other legal process, except as otherwise may be provided by Federal laws."  *Id.*

Section 8470(a), however, is expressly applicable only to "[a]n amount payable under subchapter II, IV, or V of this chapter."  The TSP is established in subchapter III of the applicable chapter.  Mr. Campbell contends that because the order of precedence provision, § 8424(d), is located in subchapter II, then § 8470(a)—which itself is located in subchapter VI—must also apply to TSP payments.  That interpretation is directly at odds with the plain language of § 8470(a).  We will not read a statutory cross-reference to the order of precedence to overcome Congress's clearly indicated intent to omit subchapter III from the application of § 8470(a).

Regardless, even if it applied, § 8470(a) would not compel a different result.  It applies to amounts "payable," not amounts "paid."  Congress knew how to say otherwise, as it has in the Social Security Act.  *See* 42 U.S.C. § 407(a) ("[N]one of the moneys *paid or payable* or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, or other legal process or the operation of any bankruptcy or insolvency law." (emphasis added)).

31

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND REVERSED WITH INSTRUCTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY; COSTS TO BE PAID BY RESPONDENTS.**